IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JEANETTE ETHEREDGE, | ) | Civil Action No. 4:08-3167-SB-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

The plaintiff, Jeanette Etheredge, filed applications for DIB and SSI on May 21, 2003, alleging a disability onset date of June 16, 2002. (Tr. 17, 59, 63). Plaintiff requested a hearing (Tr. 55) before an administrative law judge (ALJ) after her claim was denied initially and on reconsideration. (Tr. 17, 40-44, 45-49, 52-54). A hearing was held on January 11, 2006, before Thomasine G. Mason, ALJ, at which plaintiff appeared with her counsel, Ronald A. Hightower, and testified. A vocational expert, Mary L. Cornelius, also testified at the hearing. (Tr. 473-545).

The ALJ issued a decision on August 24, 2006, finding that plaintiff was not disabled because she could perform a limited range of unskilled, sedentary work. (Tr. 26-27). The Appeals Council denied plaintiff's request for review of the ALJ's decision on July 17, 2008 (Tr. 6-9) thus making the ALJ's decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g). See 20 C.F.R. §§ 404.981 and 416.1481. The plaintiff filed this action on September 16, 2008.

## II. FACTUAL BACKGROUND

The plaintiff, Jeanette Etheredge, was born January 12, 1963 and was 39 years old on the alleged disability onset date (Tr. 26) and 43 years old at the time of the ALJ's decision. Her past relevant work experience is as a clothes presser at a dry cleaner and as a dietary assistant in a nursing home. (Tr. 26, 89, 495-496). Plaintiff testified that she finished the 12th grade. (Tr. 26, 489). Plaintiff alleged disability due to musculoskeletal pain; right knee, ankle, and wrist problems; headaches; vision problems; obesity; depression, anxiety and mental retardation.

## III. DISABILITY ANALYSIS

The plaintiff's arguments consist of the following, quoted verbatim:

1. The ALJ erroneously assessed Listing 12.05.

2. The ALJ erred in failing to consider obesity and SSR 02-1p.

3. The approach the ALJ used with the Grids was erroneous.

4. The ALJ erred in determining other jobs existed for plaintiff.

5. The ALJ erred in failing to follow the treating physician rule.

6. The ALJ erred in failing to give proper weight to the subjective complaints of plaintiff.

7. The ALJ erred in failing to give proper weight to the consultative evaluation of Guy C. Heyl, Jr. M.D.

8. Commissioner failed to show other jobs existed.

9. Failing to find plaintiff met or equaled listing.

10. Error in weighing credibility of medical sources.

In her decision of August 24, 2006, the ALJ made the following findings of fact and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since June 16, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*,, 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: osteoarthritis, obesity, right lateral patello femoral compression syndrome, right lateral meniscal tear, right anterior ankle impingement, right carpal tunnel syndrome and hypertension (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity of sedentary work, or work which involves occasionally lifting and/or carrying a maximum of 10 pounds; frequently lifting and/or carrying small objects; involving sitting at least six hours a day; and involving a certain amount of walking or standing, with a maximum of two hours a day; with a sit/stand option.

6. The claimant is unable to perform any past relevant work (20 CFR404.1565 and 416.965).

7. The claimant was born on January 12, 1963, and was 39 years old on the alleged disability onset date, which is

defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  The claimant has no transferable skills since all past relevant work has been unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from June 12, 2002 , through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "supported by substantial evidence" means "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). Under the Social Security Act (the Act), 42 U.S.C. § 405 (g), this Court's scope of review of the Commissioner's final decision is limited to determining: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U.S. 389, 390 (1971). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow.

It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a and 416.920, 416.920a. An ALJ must consider: (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Part 404, Subpart P, Appendix 1), (4) whether the claimant has an impairment which prevents past relevant work, and (5) whether the claimant's impairments prevent her from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5), pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. §§ 404.1505(a) and 416.905(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and if proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually

performed the work. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423 (d)(5). She must make a prima facie showing of disability by showing she is unable to return to her past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the national economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.


## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds that many of the reports are relevant to the issues in this case. The medical reports as set out by the Commissioner in his brief have not been seriously disputed by the plaintiff. Therefore, the medical evidence as stated by the Commissioner is set forth herein.

**Medical Evidence Prior To The Alleged Onset of Plaintiff's Disability**

Plaintiff had arthroscopic surgery on her right knee in March 1997. (Tr. 294). She continued to report knee pain after the surgery. Steven T. Carawan, M.D., declined her request for a note stating that she was unable to work, opined that she could work without restrictions (although he noted that she "may benefit from finding a job where she doesn't have to be on her feet"), and advised her to lose weight. (Tr. 288, 293).

In April 1999, John H. Cathcart, III, M.D., diagnosed plaintiff with extensor tendinitis in her right wrist, after she complained of right arm pain. (Tr. 287). He subsequently noted that her wrist was "somewhat better" after an injection. (Tr. 285). About three years later, Deborah Grate, M.D., diagnosed plaintiff with tendinitis in her right wrist, and prescribed ibuprofen and the use of a wrist splint. (Tr. 210).

After falling at work in August 2001, plaintiff complained of back, neck and knee pain, and indicated that she was unable to work due to pain. (Tr. 157). She also reported that she had been diagnosed with broken ribs, although x-rays of her ribs did not support this diagnosis. (Tr. 163; see also, Tr. 156, 347). W. Alaric Van Dam, M.D., observed that plaintiff was in "no acute distress," although she walked with "an exaggerated painful gait" and gave a "hyper exaggerated" response "to even light touch of the paraspinal muscles." (Tr. 157). Dr. Van Dam observed that plaintiff complained of "multiple symptoms which do not seem to be clearly evident on clinical exam" and opined that there was "some exaggeration of her responses." (Tr. 157). He recommended that plaintiff return to her regular job in the nursing home and discharged her from his care. (Tr. 157).

Franklin M. Epstein, M.D., also treated plaintiff after her 2001 fall at work. Dr. Epstein noted that, although she reported pain in her lower back with a sneeze or cough, plaintiff did not experience "provocation of symptomatology" with range of motion in the neck or back, and she seemed "minimally distracted by her pain." (Tr. 155-156). Plain films of the lumbar spine did not show any evidence of spondylosis (osteoarthritis of the lumbar vertebrae). (Tr. 156). Dr. Epstein diagnosed plaintiff with cervical and lumbar contusion/strain, and released her to work with the following restrictions: no lifting more than 10 pounds, and no repetitive bending or stooping. (Tr. 154).

**Medical Evidence During The Relevant Time Period**

During June 2002, plaintiff fell at work and twisted her ankle. (Tr. 166). X-rays of her knee did not show a fracture, but she had some crepitus (crackling or popping sound) upon palpation. (Tr. 174). Treatment notes from Riley Family Practice during June 2002 indicate that plaintiff's ankle was not swollen or red and had minimal tenderness, and that "physical findings that are truly objective are minimal." (Tr. 176). The notes further indicate that, although plaintiff walked with an altered gait, she supported 100% of her weight with her leg fully extended. (Tr.177). Her doctor restricted her to sedentary work. (Tr. 173).

During June 2002, plaintiff presented to Guy C. Heyl, M.D., for a consultative examination. (Tr. 345-347). She reported lower back pain (which radiated into her left leg) and pain in her neck, right knee, and right ankle. (Tr. 346). Upon examination, Dr. Heyl noted that plaintiff could walk on her heels and toes, although she took short steps favoring her right ankle, and that flexion of her knees was limited by her obesity, not by joint pathology. (Tr. 346-347). He observed that plaintiff had normal range of motion in her right ankle and foot, although she was extremely tender over the lateral side of her ankle, and that he could not demonstrate any clinical instability in the ankle. (Tr. 347). She had reduced range of motion in her neck and some heightened sensitivity over the L5 dermatome on the left side of her back, but straight leg raise tests were negative for back pain. (Tr. 346-347). Dr. Heyl stated that plaintiff's morbid obesity made recovery from soft tissue injuries to the musculoskeletal system "extremely difficult." (Tr. 347).

Also during June 2002, Phillip H. Milner, D.O., examined plaintiff's right knee, noted that her collateral ligaments were stable and found no gross swelling, heat or ecchymosis (discolored skin) at her knee. (Tr. 188). A subsequent MRI did not show any obvious effusion of

the knee, meniscal damage or ligament damage. (Tr. 187-188). Dr. Milner noted that plaintiff's response "seem[ed] a bit unusual for such minimal findings radiographically and clinically." (Tr. 187). During September 2002, Dr. Milner noted minimal swelling and stable ligaments, as well as "certain signs of magnification," including "a pain response with any type of touch for manipulation or [range of motion]." (Tr. 187). He concluded that plaintiff had "some degree of knee injury," but was reluctant to perform an arthroscopy in light of "the inconsistencies I find with the magnification of symptoms with [range of motion]." (Tr. 187). During October 2002, Dr. Milner released plaintiff from his treatment with the following permanent restrictions: no standing for more than two hours per day; no repetitive bending, stooping or crawling; and no lifting more than 40 pounds. (Tr. 185).

During December 2002, plaintiff presented to W. Hodges Davis, M.D., for evaluation of her ankle. (Tr. 243-244). Dr. Hodges noted that plaintiff was "really hypersensitive." (Tr. 243). After an MRI showed that plaintiff had a large spur in an area where she reported ankle pain, Dr. Davis performed an ankle arthroscopy in April 2003. (Tr. 241-242). After the surgery, plaintiff began physical therapy and used a walking boot to immobilize her ankle. (Tr. 239). Two months later, Dr. Davis observed that plaintiff's wounds from the surgery were well healed, although she continued to experience some swelling and was "exquisitely tender to palpation" near the site of the surgery and with range of motion of her ankle. (Tr. 236). Dr. Davis stated that he was "at a loss as to why she continues to have such significant pain" and released her to perform "sit-down" work. (Tr. 236-238). During July 2003, Dr. Davis switched plaintiff from the boot to an AFO (ankle foot orthosis) brace. (Tr. 239). Dr. Davis subsequently released plaintiff from his care with the permanent restriction of standing no more than one hour in an eight-hour day. (Tr. 227-228).

During September 2003, plaintiff presented to John Masonis, M.D., for evaluation of her right knee. (Tr. 233-234). Upon examination, Dr. Masonis observed that range of motion in plaintiff's knee was limited only by her body size, and that her patella tracked normally (although she had some crepitus on examination) and her ligaments were stable. (Tr. 233). Dr. Masonis noted some tenderness in plaintiff's knee with hyperflexion and with a McMurray's maneuver. (Tr. 233). Dr. Masonis did not see a need for surgical intervention, and recommended physical therapy. (Tr. 234). An October 2003 MRI revealed joint effusion, but no significant meniscal or ligament pathology, and the cartilage in plaintiff's kneecap "seemed okay." (Tr. 231). Dr. Masonis referred plaintiff to Donald D'Alessandro, M.D., who noted that plaintiff appeared to have lateral patellofemoral compression syndrome and recommended a diagnostic arthroscopy and lateral release, although he counseled plaintiff that a "perhaps more important component of her care" was to work on weight loss. (Tr. 230). Dr. D'Alessandro performed the knee surgery in January 2004. Plaintiff subsequently entered physical therapy. (Tr. 226). In February 2004, she stopped using the AFO brace, and in April 2004, her physical therapist noted that she had good range of motion and strength in her ankle, and that she only complained of pain in her knees. (Tr. 354, 369-370).

Dr. Grate treated plaintiff between June 2002 and December 2003; however, apart from treating plaintiff's hypertension prior to her January 2004 knee surgery, the treatment was not related to the impairments on which the present appeal is based. (Tr. 190).

Plaintiff did not seek additional treatment for her allegedly disabling impairments until April 2005, when she presented to Charles D. Gray, M.D., for evaluation of a cyst on her right wrist. (Tr. 283). She stated that the cyst appeared about six months earlier, and reported wrist pain. Dr. Gray noted that plaintiff had not received treatment for the impairment. (Tr. 283).

Plaintiff elected to proceed with a surgical removal of the cyst, which Dr. Gray performed the following month. (Tr. 282-283). Eleven days after the surgery, Dr. Gray observed that plaintiff had full range of motion, although she experienced some edema in her fingers. (Tr. 282). Plaintiff continued to report pain in her wrist in June 2005, although the wound had healed and the cyst had not returned. (Tr. 281). The following month, plaintiff continued to complain of pain and stiffness in her wrist. (Tr. 279). Dr. Gray observed that she had limited flexion and extension in her wrist, although she had full finger flexion and extension, and recommended physical therapy to increase her range of motion and decrease her pain. (Tr. 279).

During this time period, plaintiff presented to Dr. Heyl for a second consultative examination. (Tr. 341-344). She used a cane and reported that her knee gave out frequently, and that she had almost fallen on several occasions. (Tr. 342). Plaintiff did not report any change in her knee or her ankle (although she stated that her knee bothered her "constantly" and woke her up at night). She did assert that her neck and back pain had worsened. (Tr. 342). Upon examination, Dr. Heyl noted decreased sensation in plaintiff's right arm (although she complained of the opposite - numbness in her left arm) and some decreased sensitivity over the L4 dermatome on the left side of her back, but straight leg raise tests were again negative for back pain. (Tr. 342). Plaintiff's ankle was tender, but she had normal motor strength in her legs and could fully extend her right knee (which Dr. Heyl noted was "stable"). (Tr. 342-343). Although plaintiff complained of increased neck pain, Dr. Heyl noted possible improvement in this area. (Tr. 342-343). Dr. Heyl speculated that plaintiff's weight was responsible for her complaints of increased pain, noting that "when someone weights 350 pounds, all aspects of the musculoskeletal system are placed on [sic] increasing stress." (Tr. 343). He opined that plaintiff

could not sit for six hours or walk for two hours in an eight-hour day, and that she would miss more than two days a month even if she was able to work. (Tr. 344).

In July 2005, plaintiff called Dr. Grate to report leg and lower back pain. (Tr. 321). Dr. Grate adjusted her medication. (Tr. 321). The following month, plaintiff told Dr. Grate that she was having problems providing personal care and cleaning her home because of the pain in her shoulder, knee and ankle. (Tr. 315). Upon examination, Dr. Grate noted "moderately" reduced flexion in plaintiff's back, although straight leg raise tests were negative for back pain; normal range of motion in Plaintiff's knee, with some swelling but no appreciable bruising and nontender joint lines on both sides; tenderness in plaintiff's upper back; and diffuse tenderness in plaintiff's ankle. (Tr. 315).

Plaintiff received physical therapy for her wrist between August and October 2005. (Tr. 329- 338). In October 2005, her physical therapist noted that, although plaintiff reported tingling and numbness in her wrist and hand, she was able to perform a variety of therapeutic activities which required full finger and wrist motion and use. (Tr. 329). Plaintiff was instructed to continue wearing her splint and to perform range of motion exercises throughout the day at home. (Tr. 329). Nerve conduction tests performed during this time period were consistent with moderate carpal tunnel syndrome in plaintiff's right wrist. (Tr. 277-278).

Also during October 2005, plaintiff presented to Dr. Grate with complaints of back pain and left arm pain, which began after she went to a football game that weekend. (Tr. 311). Upon examination, plaintiff had moderately reduced flexion and extension and reduced lateral motion, but normal rotation, strength and tone, and straight leg raising tests were negative for back pain. (Tr. 311). The following week, plaintiff called Dr. Grate to complain about increased knee pain. Dr. Grate advised her to apply heat. (Tr. 310). When plaintiff complained that the heat did not

help, Dr. Grate advised her to continue applying it and gave her a sample of a nonsteroidal anti-inflammatory. (Tr. 307). After plaintiff reported shoulder pain, an x-ray showed "moderate osteoarthritic changes" in her shoulder joint. (Tr. 309, 312).

Plaintiff returned to Dr. Gray in November 2005, and reported continuing wrist pain. (Tr. 448). Dr. Gray noted that he did not observe any evidence of a returning cyst or other pathology that would produce her discomfort. He advised her "that hopefully this will slowly resolve with time." (Tr. 448). During January 2006, Dr. Gray observed that plaintiff had improved flexion and extension (although she reported pain), and noted the possibility of nerve irritation. (Tr. 447). That same month, plaintiff reported to Dr. Grate with complaints of shoulder, knee, and back pain. (Tr. 407-408). Dr. Grate noted tenderness and diminished range of motion in plaintiff's right shoulder, and prescribed non-steroidal anti-inflammatories. (Tr. 407-408).

During March 2006, Plaintiff presented to Dr. Gray with complaints of right knee pain. X-rays of Plaintiff's knee were essentially normal, with possible early arthritic changes in the medial tibial femoral joint. Dr. Gray's impression was post traumatic arthritis. (Tr. 444-445). During July 2006, Dr. Gray noted some tenderness in plaintiff's finger joints, but near full flexion and extension (Tr. 440). He also noted tenderness in her right knee. (Tr. 440). An MRI of her knee showed "mild" medial compartment osteoarthritis. (Tr. 441). The following month, plaintiff reported less pain in her hands, but continuing pain in her right knee. (Tr. 439). In response to a questionnaire from plaintiff's counsel, Dr. Gray indicated that plaintiff could not use both her hands and her arms in a regular, sustained and repetitive basis. (Tr. 438). In response to a similar questionnaire, Dr. Grate indicated that plaintiff could not use both her hands and her arms in a regular, sustained and repetitive basis; that she could not sit for up to six hours in an eighth-hour day; and that, after walking a mile and a half, plaintiff must elevate her

legs for about an hour and a half. (Tr. 423-424). During a deposition taken by plaintiff's counsel, Dr. Grate testified that any activity that required fine movement of the fingers or repetitive use of the hands would aggravate plaintiff's wrist; that she needed to elevate and ice her knee after walking even one block; that she should not remain in one position for more than 30 minutes at a time; that she would need to recline for more than one hour per day; and that she would miss more than two days of work each month. (Tr. 427, 431, 433-437). Dr. Grate testified that she observed plaintiff in a "deep depression," but that plaintiff had not been suicidal and that she was not depressed to the point where she needed medication. (Tr. 431). Dr. Grate stated that, around the time of the deposition, plaintiff was 5' 8" and weighed 336 pounds. (Tr. 435).

**Psychological and Vocational Evidence**

During January 2006, plaintiff presented for a consultative evaluation by Robert E. Brabham, Ph.D. (Tr. 414-422). Plaintiff drove herself to the appointment; she told Dr. Brabham that she drove several times a week, but only for short distances and brief periods of time (30 minutes), stating that driving caused her knee, leg and back pain. (Tr. 414). Plaintiff's general appearance was good, although she was obese. (Tr. 414). She used a cane and a wrist brace. (Tr. 414). Plaintiff told Dr. Brabham that she tried riding a stationary bike, but stopped due to back and knee pain, and that she walked several times a week, using her cane, for about one mile each time. (Tr. 414, 416). She stated that she was not fully able to care for all of her personal needs. (Tr. 415). When asked to describe a typical day, plaintiff stated that she usually woke up around 9 a.m.; that it took her 20 to 25 minutes to "get going" in the morning; that she attempted to assist with light chores as much as possible; and that she tried to exercise as much as possible each day, although she stated that walking caused her pain and made her knee swell. (Tr. 415-416). She stated that she reclined or lay in bed for about six to seven hours per day, and elevated

her knee and leg for two hours per day. (Tr. 416). Upon examination, Dr. Brabham found that plaintiff was well oriented to all spheres and that her general levels of intellectual functioning were "commensurate with her educational background." (Tr. 418). Plaintiff described herself as depressed, but denied suicidal attempts or plans. (Tr. 418). Tests administered by Dr. Brabham indicated that Plaintiff had a full scale IQ of 64, a verbal IQ of 63, and a performance IQ of 72. (Tr. 419). Her test scores indicated that she had third grade reading and spelling skills and fifth grade math skills. (Tr. 419). Dr. Brabham's diagnoses included borderline intellectual functioning, pain disorder associated with both psychological factors and a generalized medical condition, generalized anxiety disorder and depressive disorder. (Tr. 419). Dr. Brabham opined that Plaintiff would be unable to work; that her pain would impair her ability to concentrate; that she would not be able to sit, stand, or walk for prolonged periods of time; and that she would not be able to use her hands and arms repetitively and continuously. (Tr. 420-422).

## V. PLAINTIFF'S SPECIFIC ARGUMENTS

**Substantial Evidence Does Not Support the ALJ's Finding That Plaintiff Failed to Meet the Requirements of Listing 12.05(C)**

Plaintiff first argues that the ALJ erroneously found that her mental impairments were not severe and did not meet or equal 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.05(C) because the ALJ improperly applied the provisions of Listing 12.05(C), improperly gave "no weight" to Dr. Robert E. Brabham's psychological and vocational evaluation of the plaintiff, and improperly invalidated the results of plaintiff's IQ test administered by Dr. Brabham.[1] Plaintiff

---

[1] Dr. Brabham's psychological and vocational evaluation of plaintiff was performed two days after the ALJ hearing, on January 13, 2006. His written report was prepared on February 9, 2006 and submitted thereafter to the ALJ. At the beginning of the hearing, the ALJ and plaintiff's attorney discussed whether the hearing should be

asserts that the ALJ's finding that Dr. Brabham's conclusions "are not supported by the overall weight of evidence" was in error because "there was no other expert opinion evidence to the contrary to that of Dr. Brabham." (Pl. R. Br. 8). Plaintiff argues that SSR 86-8 requires that "any decision as to whether an individual's impairment or impairments are medically the equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical equivalence furnished by one or more physicians designated by the Secretary." (Pl. R. Br. 11). Plaintiff points out that Dr. Brabham's psychological and vocational evaluation of plaintiff was the only psychological evaluation in the record. There is no other standardized psychological test, intelligence test, personality measure, or neuropsychological assessment of the plaintiff in the case file. Plaintiff did not initially allege disability due to mental retardation when she filed her applications for DIB and SSI. (See Tr. 63-78). Her allegation of disabling mental retardation arose as a result of Dr. Brabham's IQ testing in January 2006, and Dr. Brabham's report was not submitted until after the ALJ hearing. (Tr. 414-422). After the hearing and the submission of Dr. Brabham's IQ test results, neither the ALJ nor the Appeals Council determined that any additional inquiry into plaintiff's intellectual functioning was necessary. Plaintiff argues, therefore, that "[t]he findings of Dr. Brabham were not inconsistent with other evidence of record," and there was not substantial evidence to support the ALJ's decision to reject them. (Pl. R. Br. 8). Plaintiff asserts that it was reversible error for "[t]he ALJ [to] set her opinion against that of a licensed psychologist and vocational expert." (Pl. R. Br. 18).

---

rescheduled and whether a supplemental hearing would be necessary due to the fact that plaintiff had submitted considerable evidence concerning her physical impairments just prior to the commencement of the hearing (e.g Dr. Guy C. Heyl's consultative medical examinations and opinions), and wanted to submit additional evidence after the hearing (e.g. Dr. Brabham's consultative psychological and vocational evaluation; Dr. Deborah J. Grate's deposition; Dr. Charles D. Gray's opinion). The ALJ and plaintiff elected to proceed with the hearing, with the ALJ agreeing to hold the record open to allow plaintiff to submit her additional evidence. (See Tr. 25, 409-422).

In finding that "there is nothing in the record to indicate that the claimant had 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' which initially was manifested during the developmental period prior to age 22" (Tr. 25), the ALJ specifically referred to: (1) the plaintiff's graduation from high school without attending any special education classes, and (2) the plaintiff's work history, as the two underlying reasons for finding that plaintiff's January 2006 IQ scores were an under-representation of plaintiff's actual mental functioning. Plaintiff asserts that the ALJ was wrong, legally and factually, to rely on those two reasons. Plaintiff argues, in effect, that her low IQ scores, and the absence of any evidence that her intelligence function had changed since her developmental years, required the ALJ to assume that her IQ had remained relatively constant since her youth. Plaintiff cites Luckey v. U.S. Dept. of Health & Human Services, 890 F.2d 666 (4th Cir. 1989) and Branham v. Heckler, 775 F.2d 1271 (4th Cir. 1985),) for the proposition that "a showing of early onset for purposes of Listing 12.05 does not require IQ test or other clinical studies...performed prior to age 22." Luckey, 890 F.2d at 668.

The Commissioner contends that "plaintiff cannot establish that she met each of the specific criteria for Listing 12.05C." (Def. Br. 15). The Commissioner asserts in order to meet Listing 12.05, according to the Commissioner, the  claimant must satisfy the diagnostic description in the introductory paragraph, in addition to meeting one of the four sets of criteria set forth in paragraphs A through D of the listing. See 20 C.F.R. Part  404, Subpart P, Appendix 1, §12.00(A). Thus, to meet the requirements of Listing 12.05(C), she must demonstrate: (1) sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (i.e., onset of the impairment before the age of 22); (2) a valid verbal, performance or full scale IQ of 60 through 70; and (3) a physical or other mental

impairment imposing an additional and significant work related limitation of function. See 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.00 and 12.05(C). The Commissioner argues that the ALJ's decision was correct because the evidence does not support a finding that plaintiff had subaverage general intellectual functioning with deficits in adaptive functioning, with onset prior to the age of 22. Thus, the Commissioner asserts, even if an individual has an IQ lower than 70, mental retardation is not diagnosed "if there are no significant deficits or impairments in adaptive functioning." Id.; see also 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. [2]

A review of the record reveals that Dr. Brabham concluded, after evaluating and testing, that plaintiff had an "extremely low range" full scale IQ test score of 64, an "extremely low range" verbal IQ test score of 63, and a "borderline" performance IQ test score of 72, on the Weschler Adult Intelligence Scale - Third Edition (WAIS-III). Plaintiff had a reading standard score of 57 (3rd grade level) and an arithmetic standard score of 76 (5th grade level) on the Wide Range Achievement Test - Revision Three (WRAT-III).

Regarding Dr. Brabham's psychological and vocational evaluation, the ALJ found that:

> In January 2006, the claimant underwent a psychological and vocational evaluation by Robert E. Brabham, Ph.D. The claimant reported activities of daily living including light chores and some walking. Although claimant indicated that she needs to elevate her leg for more than two hours on some days, the record fails to show that she expressed this limitation to her treating physicians to any significant degree. This failure to report such an extreme restriction does not bolster the claimant's allegation. While the

---

[2] Listing 12.05 does not define "adaptive functioning." Regulations promulgated by the SSA provide that "[t]he definition of [mental retardation] ...in [the] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." "Technical Revisions to Medical Criteria for Determinations of Disability," 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). Given "the SSA declined to adopt any one of [these] specific definitions, ...the capsule definition of Listing 12.05 can be met if the individual is found to have, inter alia, deficits in adaptive functioning as defined by any of the four professional organizations." Durden v. Astrue, 586 F. Supp. 2d 828, 834 (S.D.Tx. 2008). See Maybank v. Astrue, 2009 U.S. Dist. LEXIS 79463 (D.S.C. August 12, 2009) at *22-23.

claimant had scores on the WAIS-III that are consistent with Listing 12.05C, there is nothing in the record to indicate that the claimant has had "significantly subaverage general intellectual functioning with deficits in adaptive functioning" which initially was manifested during the developmental period prior to age 22, as required in this 12.05C. In fact, the claimant has consistently reported her education as at least finishing the 12th grade, without any attendance with special education (Exhibit B-2E). For these reasons the undersigned Administrative Law Judge finds that test scores on the WAIS-R [sic] are not valid and are an under-representation [sic] of the claimant's actual mental functioning. The undersigned Administrative Law Judge further finds that the claimant's education and work history indicate a higher overall intellectual functioning which do [sic] not meet the requirements of Listing 12.05C.

Dr. Brabham diagnosed the claimant with pain disorder associated with both psychological factors and generalized medical condition, generalized anxiety disorder, depressive disorder and borderline intellectual functioning. Dr. Brabham opined that the claimant would not be capable of any gainful work activity (Exhibit B-18F).

While Dr. Brabham's conclusions have been considered, they have been given no weight. His conclusions are not supported by the overall weight of evidence which shows that while the claimant's impairments impact her ability to perform work, these impairments do not preclude work.

(Tr. 25)

The Fourth Circuit held, in Luckey v. U.S. Dept. of Health & Human Services, 890 F.2d 666, (4th Cir. 1989) that:

This court has recognized that the Secretary's regulation "expressly define[s] mental retardation as denoting 'a lifelong condition.'" Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985). However, the court noted that there are many possible reasons why an adult would not have obtained an IQ test early in life and the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22. Id. The court held that in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant. Id.

> The Secretary contends that Luckey's low IQ was not manifested during his developmental years as evidenced by the fact that Luckey worked for 23 years. However, there is no evidence that Luckey's IQ had changed, and the evidence that he could barely read or write was "a clear 'manifestation' of mental retardation occurring before age twenty-two." Turner v. Bowen, 856 F.2d 695, 699 (4th Cir. 1988). Further, the Secretary may not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met: "When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap." Murphy v. Bowen, 810 F.2d 433, 438 (4th Cir. 1987).

Luckey, 890 F.2d at 668-669.

In the instant case, the ALJ found that "the claimant's education and work history indicate a higher overall intellectual functioning which do [sic] not meet the requirements of Listing 12.05C." (Tr. 25). This portion of the ALJ's decision violates Luckey's prohibition against relying on the claimant's previous work history to prove non-disability where the Section 12.05(C) criteria are met. The work history on which the ALJ relied consists of evidence that plaintiff worked for five years (May 1991 through December 1996) as a clothes presser at a dry cleaners (DOT number 363.682-018; a medium, unskilled job; see Tr. 533); did not work from 1997 through December 1999; and worked as a dietary assistant at a nursing home (DOT number 319.677-014; a medium, unskilled job; see Tr. 533) for four years (December 1999 - June 2002). (See also Tr. 112, 130-133, 416 ). In Luckey, the claimant had worked for 23 years as a short order cook and cashier at a country grocery store. See Luckey, 890 F.2d at 667.

In the instant case, plaintiff completed the 12th grade (Tr. 489) but, when questioned by the ALJ at the hearing, plaintiff said that she had not had any kind of education since finishing high school (Tr. 490), and that she did not read the newspaper. (Tr. 514). Dr. Brabham administered the WAIS-III test to plaintiff and also administered the WRAT-III. The WRAT-III

results showed that plaintiff could read at a 3rd grade level and do arithmetic at a 5th grade level. (Tr. 419). Dr. Brabham specifically stated in his report that "[s]he appeared to cooperate and to give optimal effort during this evaluation. Thus, these results are believed to be valid indicators of her current levels of functioning." (Tr. 419). As stated in <u>Maybank</u>:

> Generally, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted. <u>See</u> <u>Clark v. Apfel</u>, 141 F.3d 1253, 1255 (8th Cir. 1998); <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1988); <u>Foster v. Heckler</u>, 780 F.2d 1125, 1130 (4th Cir. 1986). The Commissioner may, however, reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q. <u>Clark</u>; <u>see</u> 20 C.F.R. § 404.1527(d)(2). Indeed, test results of this sort should be examined "to assure consistency with daily activities and behavior." <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986).

<u>Maybank</u>, <u>supra</u>.

As previously stated, the record was held open for additional evidence by the ALJ who also stated that a supplemental hearing may be required. Once the report was submitted revealing plaintiff's IQ scores along with the fact that she could only read at a third grade level, there was no further development of the record to determine if plaintiff had significantly "subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, before age 22." <u>See</u> <u>Winston v. Barnhart</u>, 421 F. Supp. 2d at 1360 (referencing the importance of a claimant's school records to findings regarding the developmental period). It may be that there is no evidence that the claimant had any "deficits in adaptive behavior initially manifested . . .before age 22." However, the record needs to be

developed in this respect. The ALJ only reasoned that the claimant reported her education as completing the twelfth grade without any attendance of special education classes for finding that she did not have subaverage general intellectual functioning with deficits in adaptive functioning manifested during the developmental period prior to age 22. Additionally the ALJ stated that she gave Dr. Brabham's report "no weight" without any contradictory evidence to totally disregard the entire report. Despite the legal standard as set out above, despite the absence of any conflicting professional opinions about plaintiff's intellectual functioning, and despite the lack of any competent evidence of record that plaintiff's actual mental ability was greater than indicated by her IQ scores - aside from the fact that plaintiff finished the 12th grade without attending special education classes - the ALJ specifically found that plaintiff's WAIS-III IQ scores were invalid and rejected Dr. Brabham's entire psychological and vocational evaluation. Furthermore, the ALJ did not mention plaintiff's WRAT-III scores in her decision.

Additionally, in the hypothetical to the VE, the ALJ instructed the VE to assume she has a high school education. However, albeit the report had not been submitted at the time regarding her reading level and IQ, there were no restrictions placed on her ability to read or her IQ levels. Furthermore, it is noted that upon being asked by plaintiff's counsel if it is important in the vocational setting that she graduated from high school, the VE testified "[i]t's important but as long as the individual can read and write at least on the *fifth* grade level then that will make the difference." (Tr. 537)(emphasis added). Again, based on the uncontradicted report submitted subsequent to the hearing, the plaintiff could only read at a third grade level.

It is not possible for the Court to conduct a proper review of the record to determine if there was substantial evidence to support the unfavorable decision without further developing the record in this regard.

## VI. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, speculate on a barren record devoid of the appropriate administrative analysis by developing the record as set out above.

Accordingly, IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REVERSED and that this matter be REMANDED TO THE COMMISSIONER PURSUANT TO SENTENCE FOUR for further proceedings in accordance with this opinion.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 18, 2010
Florence, South Carolina